STATE OF IOWA v. THOMAS C. ROBINSON, Appellant.

**Murder:** POISONING: INDICTMENT. An indictment for murder effected 1 by means of a felonious administration of poison, need not allege a specific intent to kill.

**Expert evidence:** HYPOTHETICAL QUESTIONS. On a prosecution for 2 murder effected by strychnine poisoning, the admission of an answer to a hypothetical question, although based in part upon facts not clearly proven, was not prejudicial where the witness subsequently gave the same answer to a question from which the objectionable matter was eliminated.

**Same.** In a prosecution for murder by strychnine poisoning, it was 3 not prejudicial error to permit a hypothetical question to a chemist, containing a symptom which defendant claimed had not been proven, where the real purport of the question was whether the chemical analysis of the contents of the stomach would reveal strychnine provided death was due to such poisoning.

**Examination of hostile witness.** On a prosecution for murder where 4 the State's witnesses seek to avoid giving testimony tending to convict the defendant, the court may in its discretion permit the State's attorney to treat them as hostile and to cross examine them respecting their testimony before the grand jury.

**Murder in first degree:** EVIDENCE. On a prosecution for murder 5 based on the felonious administration of strychnine to an infant, the evidence is reviewed and held sufficient to sustain a conviction of murder in the first degree.

*Appeal from Howard District Court.*— HON. A. N. HOBSON, Judge.

TUESDAY, DECEMBER 13, 1904.

DEFENDANT appeals from a conviction and sentence to imprisonment for life for murder in the first degree, committed by administering poison to an unnamed female infant, four days old.—*Affirmed.*

*P. H., McHugh* and *Tom H. Milner,* for appellant.

*Chas. W. Mullan,* Attorney-General, and *Lawrence De Graff,* Assistant Attorney-General, for the State.

MCCLAIN, J.— I.   The indictment alleges that defendant, " in the county aforesaid, did willfully, unlawfully, and feloniously, and with malice aforethought, administer to and cause to be taken into the stomach of a certain girl baby, then and there being, aged about four days [and otherwise specifically described], a deadly quantity of a certain deadly poison called ' strychnine,' he, the said defendant, then and there well knowing the same to be in quantity and kind, as was administered and taken, a deadly poison, by the means of the taking of which deadly poison into the stomach and body of the said girl baby, she became then and there mortally sick and of which said mortal sickness on or about [the date named], at and within the county of Howard and State of Iowa, she died," etc.   It is contended that this indictment is fatally defective because it does not allege a specific intent to kill, but this objection is, we think, entirely without merit.   The allegation of a specific intent to kill may be important where the acts themselves, as alleged, do not necessarily involve such an intent — as, for instance, in case of an assault with a deadly weapon, where, as it has been held, the allegation of intent to kill is essential, although, as a matter of evidence, such intent might be inferred from the act charged.   *State v. McCormick,* 27 Iowa, 402.   But killing by means of the will-

1. POISONING: indictment.

ful, unlawful, and felonious administration of poison is mur-
der, and murder in the first degree.    Code, section 4728.
A homicide thus committed cannot constitute murder in the
second degree or manslaughter, and therefore the specific in-
tent to kill is not an essential allegation in the indictment.
*State v. Van Tassel,* 103 Iowa, 9; *State v. Wells,* 61 Iowa,
629.    The indictment follows the form given in Bishop's
Directions & Forms, section 533, and we have not the slight-
est doubt as to its sufficiency.    *Epps v. State,* 102 Ind. 539
(1 N. E. Rep. 491).

II.    For the purpose of showing that the symptoms at-
tending the illness and death of the infant indicated poison-
ing by strychnine, expert witnesses introduced for the
prosecution were asked as to whether certain
hypothetical facts would, in their judgment,
show that death occurred from that cause.    The
objection interposed by the defendant to the hypothetical ques-
tions was that some of the symptoms assumed therein were
not shown by the evidence to have existed.    Without setting
out at length the questions or the evidence on which they were
predicated, it is sufficient to say that the principal objection
was to the inclusion in the question of the throwing back of
the head, as a characteristic symptom of convulsions due to
strychnine poisoning, while it is contended that there was
no evidence that the infant in question did throw back its
head during its illness.    It can hardly be said, however, that
there was no evidence of such fact.    One witness who was
present said, " I just seen that it jerked that way, and held
its head up that way, and rolled its eyes," and again that
the infant, while being held, " kind of threw its head over
that way.    I never could remember the way that it throwed
it over."    As this testimony was evidently accompanied with
gestures indicating the motion of the infant's head, we are
not justified in saying that this evidence, as it went to the
jury, did not indicate that the head was thrown backward.
However this may be, two of the expert witnesses were after-

2. EXPERT EVI-
DENCE: hypo-
thetical
questions.

wards recalled, and a hypothetical question propounded, from which the throwing back of the head was eliminated as a symptom accompanying the illness, and they still testified that the symptoms described in the revised question indicated strychnine poisoning.

The only other expert witness called by the prosecution to whom the hypothetical question was put was the chemist, who had examined the stomach ánd intestines of the deceased infant for traces of strychnine, and who testified that no such traces had been found. To him the. hypothetical question was put, not with reference to whether the symptoms described indicated strychnine poisoning, but with reference to whether in a case of that character he would probably succeed in detecting strychnine by his examination if strychnine poison had been administered and caused the death. Now, while it might have been error to allow the hypothetical question to be propounded if it should be conceded that the symptoms of jerking the head backward had not been shown to have been observed, yet, as bearing upon the ability of the chemist to discover strychnine in the examination of the stomach and intestines, the error was wholly without prejudice. The real question asked and answered was as to the probability of the discovery of strychnine on such examination as was made, provided the death was due to strychnine poisoning. With reference to the inclusion in the hypothetical question of the jerking of the infant's head, it was plainly of no significance. No prejudicial error was committed by the court, therefore, in overruling defendant's objections to the hypothetical questions on this ground. There was much controversy during the trial as to whether certain other symptoms included in the hypothetical questions were indicated by the testimony, but it is sufficient to say that there was some evidence as to all the other symptoms relied upon.

III. It is contended that the court erred in allowing the prosecution to treat the witnesses introduced by it as hos-

3. SAME.

tile witnesses and practically subject them to cross-examination with reference to the testimony given by

4. EXAMINATION OF HOSTILE WITNESSES.

them before the grand jury. It may be conceded that the method of examining these witnesses was rather unusual, but the court must be allowed a considerable discretion in such matters, and, if the witnesses appeared to be hostile, the method of examination pursued was permissible. Now, we think that the record before us shows that the State's witnesses were hostile to the prosecution, and sought, so far as possible, to avoid the giving of testimony which would tend to convict the defendant. Their relations with the defendant will appear from a fuller statement of the evidence given in a subsequent paragraph of this opinion, and it is sufficient here to say that, under the circumstances disclosed, we do not think that any ruling of the court with reference to the method of examining these witnesses constituted error.

IV. The instructions given are criticised at some length, but a careful consideration of the objections urged leads us to think that the criticism is without merit in any particular. As the points made in argument relate to small portions taken from various instructions, which cannot be fairly judged without setting out at length the entire paragraphs in which they are contained, we do not feel that we would be warranted in extending this opinion by the elaboration of our reasons for the conclusion that none of the objections urged are sound.

V. Finally it is argued with great apparent confidence that the verdict is not supported by the evidence, and, having now disposed of the somewhat technical objections to the proceedings on the trial, we come to a consideration of the facts which are substantially

5. MURDER IN THE FIRST DEGREE: evidence.

and satisfactorily established: The infant referred to in the indictment was one of twins, both of whom, having been in apparent good health from the time of birth, were suddenly taken sick on the fifth day after

birth, and at almost exactly the same time in the evening. One of them died about midnight; the other, near daybreak the next morning. As already suggested in this opinion, the symptoms indicated death by strychnine poisoning. The defendant was unquestionably the father of these infants, who were born out of wedlock; and he had for more than a year prior to their birth been living with the parents of the infants' mother, she being an unmarried woman. During that period, defendant had, to the knowledge of this woman's parents, and in their home, sustained illicit relations with her, although he was known to have a wife living. No objection to this relation seems to have been made on the part of the young woman's parents, save that on one occasion her father threatened to compel the defendant to leave on account of his relations with the daughter, but was pacified by the assurance of defendant that he was going to get a divorce from his wife, and would then marry the daughter. Within the domestic circle the father and mother of these infants were practically treated as though they sustained the legitimate relation of husband and wife. On the afternoon preceding the first symptom of illness on the part of the infants, the defendant purchased strychnine in a drug store in a neighboring town, and, accompanied by a brother of the children's mother, returned to the family home, which he was making his home, although not, so far as appears, as employé or boarder. While he, with the other members of the family, was assembled in the kitchen, as was their apparent custom in the evening; and while the mother of the infants was frying meat on the stove for supper, one of the babies, which she was holding in her lap, according to her testimony, gave a jerk, which she says she thought was due to fat from the skillet flying in its face. She covered its face with a cloth, and gave it to her mother, and took up the other infant, which almost immediately exhibited the same symptoms. Her description of what subsequently took place up to the time the infants died is extremely meager and unsatisfactory. She

protests that she left them in the charge of her mother, and did not see them again but once until after they were both dead. Her father and her brother, who were also present, are equally vague in their testimony as to the care given to these babies; and the mother of the household, who seems to have had the principal charge of them during their sickness, died before the trial, so that her evidence is lacking. When the second baby was taken sick, a few minutes after the first indication of illness on the part of the first one, defendant indicated his belief that it was sick in the same way; and, after some time had elapsed, he made a remark indicating that, as they had not died already, they would probably recover. Nevertheless, before the father of the infants' mother retired for the night, defendant conversed with him as to where the babies should be buried if they died, and the next day procured lumber, with which he constructed a rude box, in which the bodies were placed; and that evening after dark, in a buggy hired by him from the livery stable, accompanied by the father and brother of the infants' mother, defendant took this box to the cemetery and buried it. From the time the twins were born until after they were buried, no doctor was called, and no neighbor was advised either of the birth of the children or of their death, and the first steps towards securing publicity were taken by neighbors whose curiosity had been aroused. True, the illegitimacy of the infants might explain the omission of the usual announcement to neighbors and friends of their birth; but, if it was intended that they should live, it would not explain failure to call a physician or outside assistance. On the other hand, the relation of the defendant to these illegitimate babes would furnish a possible motive to be taken into account in seeking an explanation for his conduct. Defendant testified as a witness, but threw no particular light on the circumstances above detailed. He attempted to explain the purchase of the strychnine, however, by testifying to a conversation with a man for whom he had been working occasionally in regard to

the poisoning of gophers and ground hogs; and he claimed that, being referred by this man to his wife for strychnine, he was told by her that she had none, and that he could get some at the drug store. This, as defendant testifies, took place on the very afternoon when the strychnine was procured, and the testimony of the wife lends some corroboration to his story that he asked her for strychnine, although her husband was quite positive that he did not remember any conversation · with defendant in regard to the poisoning of gophers and ground hogs. While defendant was in custody he gave the same explanation of the procuring of the strychnine, and asserted that he had put it on corn in gopher holes in the woods; but, when asked to go with the officer and point out the places where he had put the corn, he refused to do so, assigning as a vague excuse the difficulty of finding the places. These circumstances, however, have really nothing to do with the case against the defendant. He procured and had in his possession this strychnine before the children were taken sick, and had the opportunity to administer it to them, for they were fed several times from milk mixed with water kept for that purpose, and it appears he assisted in caring for them. They were taken sick almost simultaneously with symptoms not simply consistent with, but, by the testimony of experts, strongly indicative of, strychnine poisoning. No effort was made by defendant to call assistance, his curiosity as to the nature of their serious illness seems not to have been aroused, and he apparently regarded it from the first as likely to terminate fatally, until after the lapse of two or three hours he expressed the thought that the babes might get over it. It is true that the prosecution rests on circumstantial evidence, but we think the circumstances amply justified the jury in the finding that the death of the infants was, beyond a reasonable doubt, due to the criminal act of defendant, and that he was therefore properly convicted.

The judgment of the trial court is therefore *affirmed.*